## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EMPLOYERS AND LABORERS LOCALS 100 AND 397 HEALTH AND WELFARE FUND and STEAMFITTERS LOCAL 439, individually and on behalf of all others similarly situated, | Civil Action No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ZHEJIANG HUAHAI PHARMACEUTICAL CO., LTD.; HUAHAI US INC.; PRINSTON PHARMACEUTICAL INC. d/b/a SOLCO HEALTHCARE LLC; SOLCO HEALTHCARE US, LLC; HETERO LABS, LTD.; HETERO DRUGS, LIMITED; HETERO USA INC.; CAMBER PHARMACEUTICALS, INC.; MYLAN LABORATORIES, LTD.; MYLAN N.V.; MYLAN PHARMACEUTICALS, INC.; AUROBINDO PHARMA, LTD.; AUROBINDO PHARMA USA, INC.; AUROLIFE PHARMA, LLC; TEVA PHARMACEUTICALS LTD.; TEVA PHARMACEUTICALS USA, INC.; ARROW PHARM MALTA LTD.; ACTAVIS PHARMA, INC.; ACTAVIS, LLC; TORRENT PRIVATE LIMITED; TORRENT PHARMACEUTICALS, LTD.; TORRENT PHARMA, INC.; "JOHN DOE" WHOLESALERS; A-S MEDICATION SOLUTIONS, LLC; BRYANT RANCH PREPACK, INC.; H J HARKINS CO., INC. d/b/a PHARMA PAC; MAJOR PHARMACEUTICALS, INC.; REMEDYREPACK, INC.; NORTHWIND PHARMACEUTICALS; NUCARE PHARMACEUTICALS, INC.; PREFERRED PHARMACEUTICALS, INC.; AVKARE, INC.; WALGREENS BOOTS ALLIANCE, INC.; CVS HEALTH CORPORATION; WALMART INC.; RITE AID | |

1

CORPORATION; THE KROGER, CO.;
MEDICINE SHOPPE INTERNATIONAL,
INC.; EXPRESS SCRIPTS, INC.; EXPRESS
SCRIPTS HOLDING COMPANY; PRAXIS
SPECIALTY PHARMACY, LLC; and
"JOHN DOE" PHARMACIES,

     Defendants.

Plaintiffs, Employers and Laborers Locals 100 and 397 Health and Welfare Fund ("Laborers Locals 100 and 397") and Steamfitters Local 439 (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants to recover for the economic harm caused by Defendants as a result of Plaintiffs' and other Class members' reimbursements for Defendants' adulterated, misbranded, and/or unapproved valsartan and VCDs ("VCDs") illegally manufactured, sold, labeled, marketed and distributed in the United States as FDA-approved generic versions of Diovan, Diovan HCT, Exforge, and Exforge HCT and allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Valsartan is an angiotensin II receptor blocker used to treat high blood pressure and heart failure.

2.    Valsartan and VCDs are generic versions of the branded registered listed drugs ("RLDs") Diovan, Diovan HCT, Exforge, and/or Exforge HCT.

3.    Generic drugs like valsartan are required under the Federal Food, Drug, and Cosmetic Act to be bioequivalent to the branded version of the drug and are represented as such.

4.    Plaintiffs and Class members are third-party payors ("TPPs")—private health insurance companies, third-party administrators, health maintenance organizations, municipalities

or governmental entities health and welfare funds that make payments from their own funds and other health benefit providers and entities with self-funded plans that contract with health insurers or administrators to administer prescription drug benefits.

5.      Plaintiffs and Class members' beneficiaries who ingested VCDs manufactured, distributed, and sold by Defendants were exposed to N-nitrosodimethylamine ("NDMA"), a probable human carcinogen, N-nitrosodiethylamine ("NDEA"), a suspected human carcinogen, and potentially other unsafe, non-FDA-approved ingredients.

6.      Defendants knew or had reason to know that their VCDs were adulterated, misbranded, not FDA-approved, and would increase the risk of cancer to users.

7.      Plaintiffs seeks compensatory damages, punitive damages, restitution, declaratory judgment, costs and expenses of suit herein incurred, pre- and post-judgment interest on any amounts awarded, reasonable attorneys' fees and expert fees, and such other and further relief as the Court may deem proper.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

9.      This Court has personal jurisdiction over Defendants because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Illinois, including the purchase

and reimbursement of VCDs and the administration of Plaintiffs' funds, and Defendants purposefully availed themselves of the benefits and protections of Illinois.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants are subject to the Court's personal jurisdiction and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Illinois.

## PARTIES

### A. Plaintiffs

11.    Plaintiff Laborers Locals 100 and 397 is located in Edwardsville, Illinois. Plaintiff Laborers Locals 100 and 397 is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), and as defined by §§ 1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* As such, Plaintiff Laborers Locals 100 and 397 is an entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).

12.    Plaintiff Laborers Locals 100 and 397 is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees (collectively, "beneficiaries"). Plaintiff Laborers Locals 100 and 397 administers the health and welfare fund in Illinois, and its beneficiaries who purchased VCDs are located in Illinois and Florida. Beneficiaries of Plaintiff Laborers Locals 100 and 397 purchased what they believed were medically-necessary VCDs during the Class Period for personal use. Plaintiff Laborers Locals 100 and 397 is ultimately at risk and responsible for reimbursing or paying for beneficiaries' purchases of prescription drugs.

4

As such, Plaintiff Laborers Locals 100 and 397, like other Class members, paid for the VCDs which they would not have paid for had they known they were adulterated, misbranded, and not approved by the FDA.

13.    Through this fraudulent and tortious scheme, Defendants caused Plaintiff Laborers Locals 100 and 397 to pay for VCDs which were adulterated, misbranded, and not approved by the FDA and, as such, Defendants could not lawfully sell them. Examples of such payments by Plaintiff Laborers Locals 100 and 397 are indicated below.

| Product | Patient Pay Amount | Plan Pay Amount | Quantity | Labeler | Date |
|---------|--------------------|-----------------|----------|---------|------|
| VALSART/HCTZ TAB 320-12.5 | $10.00 | $287.31 | 90 | Aurobindo Pharma Limited | 1/14/2017 |
| VALSART/HCTZ TAB 80-12.5 | $10.00 | $202.81 | 90 | Aurobindo Pharma Limited | 2/14/2017 |
| VALSART/HCTZ TAB 320-12.5 | $10.00 | $287.31 | 90 | Aurobindo Pharma Limited | 3/18/2017 |
| VALSART/HCTZ TAB 80-12.5 | $10.00 | $202.81 | 90 | Aurobindo Pharma Limited | 5/3/2017 |
| VALSARTAN TAB 80MG | $10.00 | $292.40 | 90 | Solco Healthcare Us, Llc | 5/15/2017 |
| VALSART/HCTZ TAB 320-12.5 | $10.00 | $287.31 | 90 | Aurobindo Pharma Limited | 6/4/2017 |
| VALSART/HCTZ TAB 160-25MG | $10.00 | $255.05 | 90 | Aurobindo Pharma Limited | 7/11/2017 |
| VALSART/HCTZ TAB 80-12.5 | $10.00 | $202.81 | 90 | Aurobindo Pharma Limited | 7/20/2017 |
| VALSARTAN TAB 80MG | $10.00 | $292.40 | 90 | Solco Healthcare Us, Llc | 8/4/2017 |
| VALSART/HCTZ TAB 320-12.5 | $10.00 | $287.31 | 90 | Aurobindo Pharma Limited | 11/8/2017 |
| VALSARTAN TAB 80MG | $10.00 | $292.40 | 90 | Solco Healthcare Us, Llc | 11/28/2017 |
| VALSARTAN TAB 80MG | $10.00 | $292.40 | 90 | Solco Healthcare Us, Llc | 2/16/2018 |
| VALSARTAN TAB 80MG | $10.00 | $292.40 | 90 | Solco Healthcare Us, Llc | 5/10/2018 |
| VALSARTAN TAB 80MG | $10.00 | $292.40 | 90 | Solco Healthcare Us, Llc | 5/21/2018 |
| VALSART/HCTZ TAB 320-12.5 | $10.00 | $287.31 | 90 | Solco Healthcare Us, Llc | 5/21/2018 |

14.     Plaintiff Steamfitters Local 439 is located in Caseyville, Illinois. Plaintiff Steamfitters Local 439 is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5), and as defined by §§ 1002(1) and (3) of ERISA, 29 U.S.C. § 1001, *et seq.* As such, Plaintiff Steamfitters Local 439 is an entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).

15.     Plaintiff Steamfitters Local 439 is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees (collectively, "beneficiaries").

16.     Plaintiff Steamfitters Local 439 administers the health and welfare fund in Illinois, and its beneficiaries who purchased VCDs are located in Arizona, Illinois, Missouri, New York, and Florida. Beneficiaries of Plaintiff Steamfitters Local 439 purchased what they believed were medically-necessary VCDs during the Class Period for personal use. Plaintiff Steamfitters Local 439 is ultimately at risk and responsible for reimbursing or paying for beneficiaries' purchases of prescription drugs. Plaintiff Steamfitters Local 439, like other Class members, paid for the VCDs which they would not have paid for had they known they were adulterated, misbranded, and not approved by the FDA.

17.     Through this fraudulent and tortious scheme, Defendants caused Plaintiff Steamfitters Local 439 to pay for VCDs which were adulterated, misbranded, and not approved by the FDA and, as such, Defendants could not lawfully sell them. Examples of such payments by Plaintiff Laborers Locals 100 and 397 are indicated below.

| Product | Patient Pay Amount | Plan Pay Amount | Quantity | Labeler | Date |
|---------|--------------------|-----------------|----------|---------|------|

| | | | | | |
|---|---|---|---|---|---|
| VALSARTAN TAB 320MG | $13.18 | $39.55 | 30 | Torrent Pharmaceuticals Limited | 6/18/2015 |
| VALSARTAN TAB 320MG | $13.64 | $40.90 | 30 | Torrent Pharmaceuticals Limited | 8/31/2015 |
| VALSARTAN TAB 320MG | $33.74 | $101.22 | 90 | Solco Healthcare Us, Llc | 12/14/2015 |
| VALSARTAN TAB 160MG | $30.19 | $90.56 | 90 | Solco Healthcare Us, Llc | 5/7/2016 |
| VALSARTAN TAB 320MG | $31.22 | $93.67 | 90 | Solco Healthcare Us, Llc | 5/30/2016 |
| VALSART/HCTZ TAB 160-25MG | $28.27 | $84.81 | 90 | Aurobindo Pharma Limited | 7/15/2016 |
| VALSARTAN TAB 160MG | $27.56 | $82.67 | 90 | Solco Healthcare Us, Llc | 8/3/2016 |
| VALSARTAN TAB 160MG | $17.77 | $53.31 | 90 | Solco Healthcare Us, Llc | 8/1/2017 |
| VALSARTAN TAB 160MG | $17.77 | $53.31 | 90 | Solco Healthcare Us, Llc | 10/17/2017 |
| VALSARTAN TAB 320MG | $24.19 | $72.57 | 90 | Solco Healthcare Us, Llc | 12/27/2017 |
| VALSART/HCTZ TAB 160-25MG | $13.41 | $40.24 | 90 | Aurobindo Pharma Limited | 4/18/2018 |
| VALSART/HCTZ TAB 320-12.5 | $20.80 | $62.40 | 90 | Solco Healthcare Us, Llc | 6/6/2018 |

18.     Consumers' purchases of VCDs, including those of Plaintiffs and Class members' beneficiaries, are medically necessary, and thus, are non-discretionary purchases.

19.     Plaintiffs and Class members paid for their beneficiaries' prescriptions of VCDs. These payments arose from Defendants' sales of VCDs to beneficiaries for the medically-necessary treatment of illnesses which qualify as transactions that resulted in the sale of goods to consumers for personal use.

20.     Plaintiffs and Class members have been injured in their business or property by having paid or reimbursed for VCDs that they otherwise would not have due to Defendants' misconduct alleged herein. Each Plaintiff was injured by the illegal, unjust, and deceptive conduct described herein, both individually and in a manner that was common and typical of Class members.

**B.  Active Pharmaceutical Ingredient ("API") Manufacturer Defendants**

### i.    ZHP Defendants

21.    Defendant Zhejiang Huahai Pharmaceutical Co., Ltd. ("ZHP") is a Chinese corporation with its principal place of business in Zhejiang, China and a United States headquarters in Cranbury, New Jersey. ZHP on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this action, ZHP has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

22.    Defendant Huahai US Inc. ("Huahai US") is a New Jersey corporation with its principal place of business Cranbury, New Jersey. Huahai US is the wholly-owned subsidiary of ZHP. Huahai US "focus[es] on the sales and marketing of [ZHP's] APIs and Intermediates." At all times material to this case, Huahai has been engaged in the manufacture, sale, and distribution of adulterated and/or misbranded generic VCDs in the United States.

23.    Defendant Prinston Pharmaceutical Inc. d/b/a Solco Healthcare LLC ("Prinston") is a Delaware corporation with its principal place of business in Cranbury, New Jersey. Defendant Prinston is a majority-owned subsidiary of ZHP. At all times material to this case, Prinston has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded generic VCDs in the United States.

24.    Defendant Solco Healthcare US, LLC ("Solco") is a Delaware limited liability company with its principal place of business in Cranbury, New Jersey. Solco is a wholly-owned subsidiary of Prinston and ZHP. At all times material to this case, Solco has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded generic VCDs in the United States.

25.    Collectively, ZHP, Huahai US, Prinston, and Solco will be referred to as the "ZHP Defendants."

**ii.    Hetero Defendants**

26.    Defendant Hetero Labs, Ltd. ("Hetero Labs") is a foreign corporation with its principal place of business in Telangana, India. Hetero Labs on its own and/or through its subsidiaries regularly conducts business in New Jersey and throughout the United States and its territories and possessions. At all times material to this action, Hetero Labs has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

27.    Defendant Hetero Drugs, Limited ("Hetero") is a foreign corporation with its principal place of business in Telangana, India. "Hetero has a strong established global presence with 36 manufacturing facilities and a robust network of business partners and marketing offices strategically located across the world." Hetero on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. Hetero Labs is the wholly-owned subsidiary of Hetero. At all times material to this action, Hetero has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

28.    Defendant Hetero USA Inc. ("Hetero USA") is "the US representation of HETERO, a privately owned; researched based global pharmaceutical company." Hetero USA is a Delaware corporation with its principal place of business in Piscataway, New Jersey. Hetero USA is the wholly-owned subsidiary of Hetero. At all times material to this action, Hetero USA has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

29.     Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey. Camber is the wholly owned subsidiary of Hetero Drugs. At all times material to this action, Camber has been engaged in the manufacturing, sale, and distribution of adulterated, misbranded, and/or unapproved VCDs throughout the United States.

30.     Collectively, Hetero Labs, Hetero, Hetero USA, and Camber will be referred to as the "Hetero Defendants."

### iii.     Mylan Defendants

31.     Defendant Mylan Laboratories, Ltd. ("Mylan Laboratories") is a foreign corporation with its principal place of business in Hyderabad, India. Mylan Laboratories on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this action, Mylan Laboratories has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

32.     Defendant Mylan N.V. ("Mylan") is a global generic and specialty pharmaceuticals company registered in the Netherlands with principal executive offices in Hatfield, Hertfordshire, UK and a Global Center in Canonsburg, Pennsylvania. According to Mylan's website: "[t]he Chief Executive Officer and other executive officers of Mylan carry out the day-to-day conduct of Mylan's worldwide businesses at the company's principal offices in Canonsburg, Pennsylvania." Mylan Laboratories is a wholly owned subsidiary of Mylan. At all times material to this action, Mylan on its own and/or through its subsidiaries regularly conducted business throughout the United States and its territories and possessions. Mylan has been engaged in the manufacturing,

sale, and distribution of adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

33.    Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharmaceuticals") is a West Virginia corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan Pharmaceuticals is the registered holder of Mylan Laboratories' ANDA for its VCDs. At all times material to this action, Mylan Pharmaceuticals has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

34.    Collectively, Mylan Laboratories, Mylan, and Mylan Pharmaceuticals will be referred to as the "Mylan Defendants."

### iv.    Aurobindo Defendants

35.    Defendant Aurobindo Pharma, Ltd. ("Aurobindo") is a foreign corporation with its principal place of business in Telangana, India and a United States headquarters in East Windsor, New Jersey. Aurobindo on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this case, Aurobindo has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded VCDs in the United States.

36.    Defendant Aurobindo Pharma USA, Inc. ("Aurobindo USA") is a Delaware corporation with its principal place of business in East Windsor, New Jersey. It is a wholly-owned subsidiary of Aurobindo. At all times material to this case, Aurobindo USA has been engaged in the manufacturing, sale, and distribution of VCDs in the United States.

37.    Defendant Aurolife Pharma, LLC ("Aurolife") is a Delaware limited liability company with its principal place of business in Dayton, New Jersey. It is a wholly-owned

subsidiary of Aurobindo USA. At all times material to this case, Aurolife has been engaged in the manufacturing, sale, and distribution of VCDs in the United States.

38.     Aurobindo, Aurobindo USA, and Aurolife are collectively referred to as the "Aurobindo Defendants."

### C. Finished-Dose Defendants

#### a. Teva Defendants

39.     Defendant Teva Pharmaceutical Industries Ltd. ("Teva") is a foreign company incorporated and headquartered in Petah Tikvah, Israel. Teva on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this case, Teva has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded generic VCDs in the United States.

40.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Teva USA is a wholly owned subsidiary of Teva. At all times material to this case, Teva USA has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded generic VCDs in the United States. Teva and Teva USA are collectively referred to as the Teva Defendants in this Complaint.

41.     Defendant Arrow Pharm Malta Ltd. ("Arrow") is a foreign corporation headquartered in Malta. Teva owns the entirety of Arrow, which on its own and/or through its parent company and subsidiaries regularly conducts business throughout the United States of America and its territories and possessions. At all times material to this case, Arrow has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded VCDs in the United States.

42.    Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Actavis Pharma is Teva's wholly owned subsidiary. At all times material to this case, Actavis Pharma has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded VCDs in the United States.

43.    Defendant Actavis, LLC ("Actavis") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Actavis is Teva's wholly owned subsidiary. At all times material to this case, Actavis has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded VCDs in the United States.

44.    Teva, Teva USA, Arrow, Actavis Pharma, and Actavis are referred to collectively as the "Teva Defendants."

**b.  Torrent Defendants**

45.    Defendant Torrent Private Limited ("Torrent") is a foreign corporation with its principal place of business in Gujarat, India and a United States headquarters in Basking Ridge, New Jersey. Torrent on its own and/or through its subsidiaries regularly conducts business throughout the United States of America and its territories and possessions. At all times material to this case, Torrent has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded VCDs in the United States.

46.    Defendant Torrent Pharmaceuticals, Ltd. ("Torrent Pharmaceuticals") is a foreign corporation with its principal place of business in Gujarat, India and a United States headquarters in Basking Ridge, New Jersey. Over seventy percent of Torrent Pharmaceuticals is owned by Torrent. Torrent Pharmaceuticals on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to

this case, Torrent Pharmaceuticals has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded VCDs in the United States.

47.     Defendant Torrent Pharma, Inc. ("Torrent Pharma") is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey. It is a wholly-owned subsidiary of Torrent Pharmaceuticals. At all times material to this case, Torrent Pharma has been engaged in the manufacturing, sale, and distribution of VCDs in the United States.

48.     Torrent, Torrent Pharmaceuticals, and Torrent Pharma are referred to collectively as the "Torrent Defendants."

**D. "John Doe" Wholesaler Defendants**

49.     Upon information and belief, one or more wholesalers distributed adulterated, misbranded, and/or unapproved VCDs that were ultimately purchased by patients, including Plaintiffs' members. The true names, affiliations, and/or capacities of John Doe Wholesalers are not presently known. However, each John Doe proximately caused damages to Plaintiffs as alleged below, and each John Doe is liable to Plaintiffs for the acts and omissions alleged below as well as the resulting damages. Plaintiffs will amend this Complaint to allege the true names and capacities of the John Does when evidence reveals their identities.

**E. Repackager and Relabeler Defendants**

50.     Defendant A-S Medication Solutions, LLC ("A-S Medication Solutions") is a Nebraska corporation with its principal place of business in Fremont, Nebraska. A-S Medication Solutions is a repackaging company and is listed as the recalling firm for certain batches of VCDs manufactured by Teva and Prinston with API from ZHP. Upon information and belief, A-S Medication Solutions sold adulterated and/or misbranded VCDs during the class period.

51.     Defendant Bryant Ranch Prepack, Inc. ("Bryant Ranch Prepack") is a California corporation with its principal place of business in Burbank, California. Bryant Ranch Prepak is a repackager for the Teva Defendants, and sold API from ZHP. Upon information and belief, Bryant Ranch Prepak sold adulterated and/or misbranded VCDs during the class period.

52.     Defendant H J Harkins Co., Inc., d/b/a Pharma Pac ("Pharma Pac") is a California corporation with its principal place of business in Grover Beach, California. Pharma Pac is a repackager for VCDs manufactured by Prinston which contained API from ZHP. Upon information and belief, Pharma Pac sold adulterated and/or misbranded VCDs during the class period.

53.     Defendant Major Pharmaceuticals, Inc. ("Major") is a repackager for VCDs sold by the Teva Defendants which contained API from ZHP. Upon information and belief, Major sold adulterated and/or misbranded VCDs during the class period.

54.     Defendant RemedyRepack, Inc. ("RemedyRepack") is a Pennsylvania corporation with its principal place of business in Indiana, Pennsylvania. RemedyRepack is a repackager for VCDs manufactured by Prinston and Torrent Pharmaceuticals with API from ZHP. Upon information and belief, RemedyRepack sold adulterated and/or misbranded VCDs during the class period.

55.     Defendant Northwind Pharmaceuticals ("Northwind") is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Northwind is also a repackager for the Teva Defendants. Upon information and belief, Northwind sold adulterated and/or misbranded VCDs during the class period.

56.     Defendant NuCare Pharmaceuticals, Inc. ("NuCare") is a California corporation with its principal place of business in Orange, California. Upon information and belief, NuCare sold adulterated and/or misbranded VCDs during the class period.

57.     Defendant Preferred Pharmaceuticals, Inc. ("Preferred Pharmaceuticals") is a California corporation with its principal place of business in Anaheim, California. Preferred Pharmaceuticals is a repackager for VCDs manufactured by the Hetero Defendants. Upon information and belief, Preferred Pharmaceuticals sold adulterated and/or misbranded VCDs during the class period.

58.     Defendant AvKARE, Inc. ("AvKARE") is a Tennessee corporation with its principal place of business in Pulaski, Tennessee. AvKARE is a repackager for the Hetero and Teva Defendants. Upon information and belief, AvKARE sold adulterated and/or misbranded VCDs during the class period.

**F.  Pharmacy Defendants**

59.     Pharmacies sell VCDs supplied by finished-dose manufacturers to patients, including Plaintiffs' members. They are in direct contractual privity with patients.

60.     Defendant Walgreens Boots Alliance, Inc. ("Walgreens") is a Delaware corporation with its principal place of business in Deerfield, Illinois. Walgreens is one of the largest operators of retail pharmacies in the United States, operating in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands. Walgreens, through its pharmacies and pharmacies that it owns or formerly owned (including Diplomat Pharmacy), sold a substantial number of adulterated and/or misbranded VCDs directly to patients throughout the United States during the class period.

61.     Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. CVS Health is one of the largest operators of retail pharmacies in the United States, operating in all 50 states, the District of Columbia, and Puerto Rico. CVS Health, through its pharmacies and pharmacies that it owns or formerly owned (including Target Corporation's pharmacies), sold a substantial number of adulterated and/or misbranded VCDs directly to patients throughout the United States during the class period.

62.     Defendant Walmart Inc. ("Walmart") is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart is one of the largest operators of retail pharmacies in the United States, operating in all 50 states, the District of Columbia, and Puerto Rico. Walmart, through its pharmacies and pharmacies that it owns or formerly owned, sold a substantial number of adulterated and/or misbranded VCDs directly to patients throughout the United States during the class period.

63.     Defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with its principal place of business in Camp Hill, Pennsylvania. Rite Aid is one of the largest operators of retail pharmacies in the United States, operating in 29 states and the District of Columbia. Rite Aid, through its pharmacies and pharmacies that it owns or formerly owned, sold a substantial number of adulterated and/or misbranded VCDs directly to patients throughout the United States during the class period.

64.     Defendant The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Kroger is one of the largest operators of retail pharmacies in the United States, operating in 37 states. Kroger, through its pharmacies and pharmacies that it

owns or formerly owned, sold a substantial number of adulterated and/or misbranded VCDs directly to patients throughout the United States during the class period.

65.     Defendant Medicine Shoppe International, Inc. ("Medicine Shoppe") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Medicine Shoppe is one of the largest operators of retail pharmacies in the United States, operating in 43 states. Medicine Shoppe, through its pharmacies and pharmacies that it owns or formerly owned, sold a substantial number of adulterated and/or misbranded VCDs directly to patients throughout the United States during the class period.

66.     Defendants Express Scripts, Inc. and its parent Express Scripts Holding Company (collectively, "Express Scripts") are Delaware corporations with its principal place of business in St. Louis, Missouri. Express Scripts is one of the largest online prescription management companies in the United States. Express Scripts sold a substantial number of adulterated and/or misbranded VCDs directly to patients throughout the United States during the class period.

67.     Defendant Praxis Specialty Pharmacy, LLC ("Praxis") is a Delaware limited liability company with its principal place of business in Tampa, Florida. Praxis is one of the largest online prescription management companies in the United States. Praxis sold a substantial number of adulterated and/or misbranded VCDs directly to patients throughout the United States during the class period.

68.     Upon information and belief, one or more pharmacies sold adulterated, misbranded, and/or unapproved VCDs to patients, including Plaintiffs' members. The true names, affiliations, and/or capacities of John Doe Pharmacies are not presently known. However, each John Doe proximately caused damages to Plaintiffs as alleged below, and each John Doe is liable to Plaintiffs for the acts and omissions alleged below as well as the resulting damages. Plaintiffs will amend

this Complaint to allege the true names and capacities of the John Does when evidence reveals their identities.

**G. Notice to Defendants of Implied Warranty Claims**

69.    All Defendants, including the Pharmacy Defendants, received notice of Plaintiffs' implied warranty claims alleged herein by certified mail on January 8, 2020.

70.    All Defendants, including the Pharmacy Defendants, already received notice of Plaintiffs' implied warranty claims on July 13, 2018 when the FDA announced a recall of adulterated, misbranded, and unapproved VCDs for the same reasons giving rise to this complaint as alleged herein.

## FACTUAL ALLEGATIONS

**A. The Recalled Drugs**

71.    On July 13, 2018, the U.S. Food and Drug Administration ("FDA") issued a press release alerting health care professionals and patients of a voluntary recall of several drugs containing the active ingredient valsartan due to the presence of NDMA found in the recalled drugs.[1]

72.    The level of NDMA in the recalled drugs was above the FDA-determined "acceptable" and "reasonably safe" level of 96 nanograms per day. "It is estimated that over the course of a person's lifetime, consuming [96 nanograms per day] of NDMA would result in less than one additional case of cancer for every 100,000 people."

73.    NDMA may have been in VCDs produced by Defendants for as long as four years.

74.    The FDA believes the presence of NDMA in the drugs was caused by chemical reactions in the process used to manufacture the drugs.

---

[1] https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity

75.    "Because valsartan is used in medicines to treat serious medical conditions," the FDA urged that "patients taking the recalled valsartan-containing medicines should continue taking their medicine until they have a replacement product."

76.    The FDA continues to update health care professionals and patients on which VCDs were adulterated with NDMA[2] and which were not.[3] The FDA's list of VCDs adulterated with NDMA shows that VCDs manufactured and distributed by Defendants were adulterated with NDMA.

77.    On September 13, 2018, the FDA issued a press release confirming that NDEA, a suspected human carcinogen, was also found in some drugs containing valsartan manufactured by ZHP.[4] The FDA later confirmed that VCDs manufactured and distributed by Defendants Mylan, Teva, Torrent, and Aurobindo were also adulterated with NDEA.[5] Like NDMA, NDEA is also formed by chemical reactions in the process used to manufacture the drugs.

78.    The FDA-determined acceptable intake of NDEA is 26.5 nanograms per day.[6]

79.    The following table outlines the VCDs currently recalled due to the presence of NDMA and/or NDEA according to the FDA[7]:

| Company | Drug |
| --- | --- |
| American Health Packaging (Aurobindo) | Valsartan 160mg Tablet |
| A-S Medication Solutions LLC (Teva/Actavis & Prinston/Solco) | Valsartan 160mg Tablet |
| | Valsartan 80mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |

[2] https://www.fda.gov/drugs/drug-safety-and-availability/search-list-recalled-angiotensin-ii-receptor-blockers-arbs-including-valsartan-losartan-and

[3] https://www.fda.gov/drugs/drug-safety-and-availability/fdas-assessment-currently-marketed-arb-drug-products

[4] https://www.fda.gov/news-events/press-announcements/fda-provides-update-its-ongoing-investigation-valsartan-products-and-reports-finding-additional

[5] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan

[6] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan

[7] https://www.fda.gov/drugs/drug-safety-and-availability/search-list-recalled-angiotensin-ii-receptor-blockers-arbs-including-valsartan-losartan-and

| | |
|---|---|
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/25mg Tablet |
| Aurobindo Pharma USA, Inc. | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 40mg Tablet |
| | Valsartan 80mg Tablet |
| Aurobindo Pharma USA, Inc. (Acetris) | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 40mg Tablet |
| | Valsartan 80mg Tablet |
| Aurobindo Pharma USA, Inc. | Amlodipine/Valsartan 10mg/160mg Tablet |
| | Amlodipine/Valsartan 10mg/320mg Tablet |
| | Amlodipine/Valsartan 5mg/160mg Tablet |
| | Amlodipine/Valsartan 5mg/320mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 80mg/12.5mg Tablet |
| AvKARE, Inc. (Hetero/Camber) | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 40mg Tablet |
| | Valsartan 80mg Tablet |
| AvKARE, Inc. (Teva/Actavis) | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 80mg/12.5mg Tablet |
| Bryant Ranch Prepack Inc. (Teva/Actavis) | Valsartan 320mg Tablet |
| | Valsartan 80mg Tablet |
| H J Harkins Company Inc. dba Pharma Pac (Prinston/Solco) | Valsartan 160mg Tablet |
| | Valsartan 160mg Tablet |

| | |
|---|---|
| Hetero Labs, Inc., labeled as Camber Pharmaceuticals, Inc. | Valsartan 320mg Tablet |
| | Valsartan 40mg Tablet |
| | Valsartan 80mg Tablet |
| Mylan Pharmaceuticals, Inc. | Amlodipine/Valsartan 10mg/160mg Tablet |
| | Amlodipine/Valsartan 10mg/320mg Tablet |
| | Amlodipine/Valsartan 5mg/160mg Tablet |
| | Amlodipine/Valsartan 5mg/320mg Tablet |
| | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 40mg Tablet |
| | Valsartan 80mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 80mg/12.5mg Tablet |
| Northwind Pharmaceuticals (Teva/Actavis) | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 80mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |
| NuCare Pharmaceuticals Inc. (Prinston/Solco) | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/25mg Tablet |
| Preferred Pharmaceuticals, Inc., labeled as Solco Healthcare | Valsartan 320mg Tablet |
| RemedyRepack Inc. (Prinston/Solco) | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/12.5mg Tablet |
| RemedyRepack, Inc. (Hetero/Camber) | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 80mg Tablet |
| RemedyRepack, Inc. (Torrent) | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 10mg/320mg/25mg Tablet |

22

| | |
|---|---|
| Rising Pharmaceuticals Inc., labeled as Acetris Health, LLC (Aurobindo) | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 40mg Tablet |
| | Valsartan 80mg Tablet |
| Solco Healthcare LLC. (Prinston) | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 40mg Tablet |
| | Valsartan 80mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 80mg/12.5mg Tablet |
| Teva Pharmaceuticals USA Inc. | Amlodipine/Valsartan 10mg/160mg Tablet |
| | Amlodipine/Valsartan 10mg/320mg Tablet |
| | Amlodipine/Valsartan 5mg/160mg Tablet |
| | Amlodipine/Valsartan 5mg/320mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 10mg/160mg/12.5mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 10mg/160mg/25mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 10mg/320mg/25mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 5mg/160mg/12.5mg Tablet |
| Teva Pharmaceuticals USA Inc., labeled as Actavis Pharma, Inc. | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 40mg Tablet |
| | Valsartan 80mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 160mg/25mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/12.5mg Tablet |
| | Valsartan/Hydrochlorothiazide (HCTZ) 320mg/25mg Tablet |

| | Valsartan/Hydrochlorothiazide (HCTZ) 80mg/12.5mg Tablet |
|---|---|
| Teva Pharmaceuticals USA Inc., labeled as Major Pharmaceuticals | Valsartan 160mg Tablet |
| | Valsartan 80mg Tablet |
| Torrent Pharmaceuticals Limited | Amlodipine/Valsartan 10mg/160mg Tablet |
| | Amlodipine/Valsartan 10mg/320mg Tablet |
| | Amlodipine/Valsartan 5mg/160mg Tablet |
| | Amlodipine/Valsartan 5mg/320mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 10mg/160mg/12.5mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 10mg/160mg/25mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 10mg/320mg/25mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 5mg/160mg/12.5mg Tablet |
| | Amlodipine/Valsartan/Hydrochlorothiazide (HCTZ) 5mg/160mg/25mg Tablet |
| | Valsartan 160mg Tablet |
| | Valsartan 320mg Tablet |
| | Valsartan 80mg Tablet |

80.    The FDA is also continuing to test VCDs manufactured and distributed by Defendants to determine precise levels of NDMA and NDEA. In this table, "Below LOD" means "below level of detection"[8]:

| Company | Drug | NDMA level (mcg/tablet) | NDEA level (mcg/tablet) |
|---|---|---|---|
| Aurobindo Pharma Ltd | Amlodipine 10mg/Valsartan 320 mg | Below LOD | 0.02-0.09 |
| Aurobindo Pharma Ltd | Valsartan 320mg | Below LOD | 0-0.05 |
| Aurobindo Pharma Ltd | Valsartan 320mg/HCT 25mg | Below LOD | 0.02-0.19 |
| Hetero Labs Ltd | Valsartan 320mg | 0.33-0.44 | Below LOD |
| Mylan Pharmaceutical Inc. | Amlodipine 10mg/Valsartan 320 mg | Below LOD | 0.04-0.11 |

[8] https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products

| Mylan Pharmaceutical Inc. | Amlodipine 10mg/Valsartan 320 mg/HCT 25mg | Below LOD | 0.05 |
|---|---|---|---|
| Mylan Pharmaceutical Inc. | Valsartan 320mg | Below LOD | 0.07-0.16 |
| Mylan Pharmaceutical Inc. | Valsartan 320mg/HCT 25mg | Below LOD | 0.20-0.38 |
| Prinston Pharmaceutical | Valsartan 320mg | 15.18-16.30 | Below LOD |
| Prinston Pharmaceutical | Valsartan 320mg/HCTZ 25mg | 13.18-20.19 | Below LOD |
| Teva Pharmaceutical | Amlodipine 10mg/Valsartan 320 mg | Below LOD | 0-0.03 |
| Teva Pharmaceutical | Amlodipine 10mg/Valsartan 320 mg/HCT 25mg | Below LOD | 0-0.03 |
| Teva Pharmaceuticals | Valsartan 320mg | 7.92-16.55 | Below LOD |
| Teva Pharmaceuticals | Valsartan 320mg/HCTZ 25mg | 6.94-10.35 | 0-0.77 |
| Torrent Pharmaceuticals | Amlodipine 10mg/Valsartan 320 mg/HCTZ 25mg | 10.24-11.53 | Below LOD |
| Torrent Pharmaceuticals | Valsartan 320mg | 0.56-0.62 | 1.12-1.22 |
| Torrent Pharmaceuticals | Valsartan 160mg | 0.45 | 1.31 |

81.     The FDA-determined acceptable level of 96 nanograms NDMA per day is equivalent to 0.096 micrograms per day, as displayed in the table above. For example, the FDA's test results show that Prinston's Valsartan 320 mg tablets contained between 15.18 and 16.30 micrograms of NDMA, and Prinston's Valsartan 320mg/HCTZ 25mg tablets contained between 13.18 and 20.19 micrograms of NDMA. This indicates that the tested tablets contained between 137 and 210 times the acceptable level of 96 nanograms NDMA per day.

82.     The FDA-determined acceptable level of 26.5 nanograms NDEA per day is equivalent to 0.0265 micrograms per day, as displayed in the table above. For example, the FDA's test results show that Torrent Pharmaceuticals' Valsartan 320 mg tablets contained between 1.12

and 1.22 micrograms of NDEA, and Torrent Pharmaceuticals' Valsartan 160 mg tablets contained 1.31 micrograms of NDEA. This indicates that the tested tablets contained between 42 and 49 times the acceptable level of 26.5 nanograms NDEA per day.

83.     All the recalled VCDs manufactured and distributed by Defendants are adulterated with NDMA and/or NDEA, and the level of NDMA or NDEA in the drugs is unacceptable and unsafe, according to the FDA.

84.     NDMA and NDEA are active ingredients[9] that were not approved by the FDA as part of the valsartan formulation.

85.     All the recalled VCDs manufactured and distributed by Defendants are therefore adulterated, misbranded drugs that were not approved by the FDA.[10]

86.     Defendants' labeling, packaging, branding, advertising, and marketing misrepresented the recalled VCDs as being safe, unadulterated, approved by the FDA, and meeting specified and expected quality and purity characteristics when they were not.

87.     Defendants' representations that their VCDs were safe, unadulterated, approved by the FDA, and meeting specified and expected quality and purity characteristics when they were not caused Plaintiffs and Class members to pay for VCDs that Defendants could not lawfully sell. As such, Plaintiffs and Class members were economically harmed and should be compensated for their economic loss.

**B. Risks from NDMA and NDEA Exposure**

88.     NDMA is considered a probable human carcinogen, meaning that high exposure or long-term exposure increases the risk of cancer, according to[11]:

---

[9] 21 C.F.R. § 210.3(b)(7)
[10] 21 U.S.C. §§ 331, 351, 352
[11] https://toxnet.nlm.nih.gov/cgi-bin/sis/search2/r?dbs+hsdb:@term+@DOCNO+1667

    a.   World Health Organization, International Agency for Research on Cancer;

    b.   The Occupational Safety and Health Administration;

    c.   U.S. Environmental Protection Agency ("EPA"); and

    d.   U.S. Department of Health & Human Services, National Toxicology Program.

89.    The EPA has found that exposure to NDMA causes tumors at multiple sites in both rodent and nonrodent mammals.

90.    "FDA scientists estimate that if 8,000 people took the highest valsartan dose (320 mg) from the recalled batches daily for the full four years, there may be one additional case of cancer over the lifetimes of these 8,000 people." Certain patients may therefore be more than 12 times more likely to develop cancer over their lifetimes due to NDMA exposure from recalled VCDs compared to the "acceptable" and "reasonably safe" level of NDMA exposure.

91.    Health Canada, Canada's national public health department, found increased cancer risk for patients taking various doses of the recalled VCDs (containing 60 ppm NDMA) for three years[12]:

    a.   40 mg valsartan daily increases cancer risk by 1 case per 93,400 people.

    b.   80 mg valsartan daily increases cancer risk by 1 case per 46,700 people.

    c.   160 mg valsartan daily increases cancer risk by 1 case per 23,300 people.

    d.   320 mg valsartan daily increases cancer risk by 1 case per 11,600 people.

92.    A study of data from the Danish Health Data Authority found that, among 3625 people using valsartan without exposure to NDMA, 104 developed cancer, while among 3450 people using valsartan with exposure to NDMA, 198 developed cancer, indicating an adjusted

---

[12] https://www.pharmiweb.com/press-release/2018-09-10/information-update-health-canada-updates-canadians-on-estimates-of-health-risks-for-recalled-valsa

hazard ratio of 1.09 (95% confidence interval 0.85 to 1.41). The study found increased risk of colorectal and uterine cancers.[13]

93.     NDEA is a human carcinogen that has also been identified as a tobacco carcinogen, meaning that high exposure or long-term exposure increases the risk of cancer, according to[14]:

     a.  World Health Organization, International Agency for Research on Cancer;

     b.  U.S. Environmental Protection Agency ("EPA"); and

     c.  U.S. Department of Health & Human Services, National Toxicology Program.

94.     The EPA has found that exposure to NDEA causes tumors at multiple sites in both rodent and nonrodent mammals.

95.     The FDA is still determining the increased cancer risk caused by unsafe levels of NDEA in the recalled VCDs.[15]

### C.  Cause of NDMA and NDEA Adulteration

96.     NDMA and NDEA are not FDA-approved ingredients in valsartan or other VCDs.

97.     The FDA advises that NDMA and NDEA should not be present in any pharmaceutical drug due to their health risks.

98.     Valsartan may be adulterated by NDMA and NDEA during the manufacturing process because of specific and predictable chemical reactions and processes. "Most ARBs have a chemical structure that includes a tetrazole group. It appears that tetrazole ring formations, coupled with certain manufacturing conditions using the solvent N, N-Dimethylformamide, aka DMF, gave rise to this class of impurities in drug substance intermediates used in sartans."[16]

---

[13] https://www.bmj.com/content/362/bmj.k3851
[14] https://toxnet.nlm.nih.gov/cgi-bin/sis/search2/f?./temp/~O3rhUV:1
[15] https://www.fda.gov/drugs/drug-safety-and-availability/more-questions-and-answers-impurities-found-certain-angiotensin-ii-receptor-blocker-arb-products
[16] https://www.pharmaceuticalonline.com/doc/nitroso-impurities-in-valsartan-how-did-we-miss-them-0001

99.    Defendants knew or had reason to know that these chemical reactions and processes would result in adulteration of VCDs with NDMA and NDEA.

100.    If Defendants followed current good manufacturing processes ("CGMP"), the adulteration would have been avoided and Plaintiffs and Class members would not have purchased cancer-causing VCDs on behalf of their beneficiaries.

101.    As described further below, Defendants recklessly failed to adhere to CGMP, resulting in the adulteration of VCDs with NDMA and NDEA.

102.    Defendants' reckless failure to adhere to CGMP resulted in adulteration of VCDs with other harmful, non-FDA-approved ingredients.

### i.    ZHP Defendants

103.    ZHP operates API manufacturing facilities in Zhejiang, China that manufacture valsartan, including the recalled VCDs.

104.    ZHP has been investigated multiple times by the FDA since it was first approved to export API to the United States, including investigations in 2007, 2016, and 2017 that found deviations from current good manufacturing processes ("CGMP").

105.    In November 2011, ZHP "approved a valsartan API process change (PCRC-11025) that included the use of [a] solvent . . . to improve the manufacturing process, increase product yield, and lower production costs."[17]

106.    ZHP was inspected by the FDA in May 2018, finding that[18]:

a.    "Appropriate controls are not implemented over Quality Control instruments to ensure the integrity of analytical testing. Furthermore, anomalies in analytical testing are not investigated." The inspector described multiple instances where

---

[17] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/zhejiang-huahai-pharmaceutical-566685-11292018

[18] https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/CDERFOIAElectronicReadingRoom/UCM616397.pdf

batches were retested due to initial failing results and impurities were not regularly reported.

b. "Facilities and equipment are not maintained to ensure quality attributes of drug product." The inspector described six instances of particulate matter, deterioration, and discoloration contaminating the products.

c. "Invalidation of out-of-specification results lacks adequate scientific justification." The inspector described three instances in which anomalies or errors were disregarded.

107. ZHP was investigated by the FDA in July and August 2018, finding that[19]:

a. "The change control system to evaluate all changes that may affect the production and control of intermediates or Active Pharmaceutical Ingredients (APIs) is not adequate." Specifically, the inspectors found that:

   i. ZHP does not "always conduct a formal risk assessment for critical changes to evaluate the potential impact of proposed changes."

   ii. ZHP does not "have an adequate change control system requiring scientific judgment to determine what additional testing and validation studies are appropriate to justify changes to a validated manufacturing process."

   iii. ZHP does not "have an adequate classification procedure for determining the level of testing, validation, and documentation needed to justify changes to a validated process."

b. "Validation of production processes, cleaning procedures, analytical methods, and in-process control test procedures are not always adequate." Specifically, the inspectors found that:

   i. ZHP's "manufacturing processes are not always capable of consistently producing final products meeting all product quality specifications."

   ii. ZHP's "written validation protocols are not always adequate."

   iii. ZHP does not "always initiate investigations during process validation."

   iv. ZHP does not "have sufficient data to demonstrate [its] in-house test methods . . . are at least equivalent to USP Monograph test methods."

   v. ZHP does not "have validated cleaning procedures."

---

[19] https://www.fda.gov/media/117875/download

c. ZHP's "quality unit lacks written procedures and the authority and responsibility to ensure all critical deviations are thoroughly investigated."

d. ZHP does not "thoroughly document investigations" or "thoroughly investigate deviations before closing the deviation."

e. ZHP does not "always follow [its] written procedures."

f. ZHP's "quality unit does not always fulfill the responsibilities of the quality unit to release or reject all APIs."

g. "Cleaning procedures do not contain sufficient details to enable operators to clean each type of equipment in a reproducible and effective manner."

h. ZHP does not "maintain equipment in a good state of repair," "have adequate lighting," or "have an adequate [redacted] sealing machine to seal [redacted] API [redacted] bags."

i. "Schedules and procedures for preventive maintenance of equipment are not adequate or do not exist."

j. "Substances associated with the operation of equipment, such as lubricants, heating fluids or coolants are not always food grade lubricants and oils."

k. "Sampling plans, and test procedures are not always scientifically sound and appropriate to ensure raw materials, intermediates and APIs conform to established standards of quality."

l. ZHP's "on-going testing program to monitor the stability characteristics of APIs to confirm appropriate storage conditions and retest dates is not adequate."

m. "Production deviations are not always reported and evaluated and critical deviations are not always investigated and the conclusions recorded."

108. Following the investigation of ZHP's facility and review of the November 2011 process change, the FDA found that ZHP "failed to adequately assess the potential formation of mutagenic impurities when [ZHP] implemented the new process. Specifically, [ZHP] did not consider the potential for mutagenic or other toxic impurities to form from [redacted] degradants, including the primary [redacted] degradant, [redacted]. According to [ZHP's] ongoing investigation, [redacted] is required for the probable human carcinogen NDMA to form during the

valsartan API manufacturing process. NDMA was identified in valsartan API manufactured at [ZHP's] facility."

109. The FDA further found that ZHP "failed to evaluate the need for additional analytical methods to ensure that unanticipated impurities were appropriately detected and controlled in [ZHP's] valsartan API before [ZHP] approved the process change. [ZHP is] responsible for developing and using suitable methods to detect impurities when developing, and making changes to, [ZHP's] manufacturing processes. If new or higher levels of impurities are detected, [ZHP] should fully evaluate the impurities and take action to ensure the drug is safe for patients."

110. ZHP argued that the NDMA formation could not have been predicted because to do so would require oversight "an extra dimension over current industry practice." The FDA rejected this argument, responding, "you are responsible for the quality of drugs you produce."

111. On December 11, 2018, the FDA issued a warning letter to ZHP summarizing "significant deviations from current good manufacturing practice," including[20]:

    a. "Failure of your quality unit to ensure that quality-related complaints are investigated and resolved."

    b. "Failure to evaluate the potential effect that changes in the manufacturing process may have on the quality of your API."

    c. "Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, your API are adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B)."

112. ZHP's recklessness, negligence, and failure to adhere to CGMP resulted in the adulteration of VCDs with NDMA and NDEA.

---

[20] https://www.fda.gov/news-events/press-announcements/fda-warns-api-manufacturer-involved-valsartan-recall-provides-information-patients-taking-these; https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/zhejiang-huahai-pharmaceutical-566685-11292018

113.    Because ZHP failed to adhere to CGMP, ZHP knew or had reason to know that their VCDs were being adulterated with NDMA and NDEA.

### ii.    Hetero Defendants

114.    Hetero operates six API manufacturing facilities in India that manufacture valsartan, including the recalled VCDs.

115.    Hetero has been investigated multiple times by the FDA since it was first approved to export API to the United States, including investigations in 2016, 2017, and 2018 that found deviations from CGMP.

116.    Hetero's Polepally Village facility was inspected by the FDA in December 2016, finding that[21]:

a.    "The responsibilities and procedures applicable to the quality control unit are not fully followed." The FDA further documented "extensive shredding" and "extensive signing" of batch packaging and batch manufacturing records four days before the inspection according to surveillance footage.

b.    "Batch production and control records are not prepped for each batch of drug product produced and do not include complete information relating to the production and control of each batch."

c.    "Written records of investigation of a drug complaint do not include the findings of the investigation and the follow-up."

d.    "The written record or copy of the record of an investigation of a complaint conducted in relation to any unexplained discrepancy is not maintained at the establishment where the investigation occurred."

e.    "Equipment and utensils are not cleaned and maintained at appropriate interval to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product."

f.    "Deviations from production time limits are not documented."

g.    "The accuracy, sensitivity, specificity and reproducibility of test methods have not been established and documented."

---

[21] https://www.fda.gov/media/102486/download

h.   "Appropriate controls are not exercised over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel."

117.   The FDA issued a warning letter to Hetero on August 15, 2017 summarizing significant CGMP violations from the December 2016 inspection, strongly recommending engaging a consultant to assist in meeting CGMP, and further stating, "Your executive management remains responsible for fully resolving all deficiencies and ensuring ongoing CGMP compliance."[22]

118.   Hetero's Bonthapally Village facility was inspected by the FDA in February and March 2018, finding that[23]:

a.   "There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet and of its specifications whether or not the batch has been already distributed."

b.   "The responsibilities and procedures applicable to the quality control unit are not fully followed."

c.   "Employees engaged in the processing, holding, and testing of a drug product lack the training and experience required to perform their assigned functions."

d.   "There is no assurance that the equipment used in the production of [redacted] API are always maintained and/or kept in/under proper conditions for manufacturing operations and to prevent the contamination of the products handled and/or processed in the equipment."

e.   "Separate or defined areas to prevent contamination or mix-ups are deficient regarding laboratory controls and operations."

119.   Hetero's recklessness, negligence, and failure to adhere to CGMP resulted in the adulteration of VCDs with NDMA and NDEA.

120.   Because Hetero failed to adhere to CGMP, Hetero knew or had reason to know that their VCDs were being adulterated with NDMA and NDEA.

---

[22] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/hetero-labs-limited-unit-v-520359-08152017
[23] https://www.fda.gov/media/114493/download

### iii.    Mylan Defendants

121.    Mylan operates eight API manufacturing facilities in India that manufacture valsartan, including the recalled VCDs.

122.    Mylan has been investigated multiple times by the FDA, both in its Indian and United States facilities, including investigations in 2013, 2014, 2015, 2016, and 2018 that found deviations from CGMP.

123.    On August 6, 2015, the FDA issued a warning letter to Mylan following inspections of three of Mylan's facilities in India, finding that[24]:

   a.   Mylan "failed to establish and follow appropriate written procedures that are designed to prevent microbiological contamination of drug products purporting to be sterile, and that include validation of all aseptic and sterilization processes (21 CFR 211.113(b))."

   b.   Mylan "failed to establish laboratory controls that include scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity (21 CFR 211.160(b))."

   c.   Mylan "failed to establish an adequate system for monitoring environmental conditions in aseptic processing areas (21 CFR 211.42(c)(10)(iv))."

   d.   Mylan had "no justification for two different action levels for finger dab results."

   e.   Mylan "failed to establish and follow appropriate written procedures that are designed to prevent microbiological contamination of drug products purporting to be sterile, and that include validation of all aseptic and sterilization processes (21 CFR 211.113(b))."

   f.   Mylan "failed to establish an adequate system for monitoring environmental conditions in aseptic processing areas (21 CFR 211.42(c)(10)(iv))."

   g.   Mylan "failed to exercise appropriate controls over computer or related systems to assure that only authorized personnel can change master production and control records, or other records (21 CFR 211.68(b))."

---

[24] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mylan-laboratories-limited-464863-08062015

h. Mylan "failed to thoroughly investigate any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications, whether or not the batch has already been distributed (21 CFR 211.192)."

i. Mylan "failed to establish an adequate system for monitoring environmental conditions in aseptic processing areas (21 CFR 211.42(c)(10)(iv))."

j. Mylan "failed to follow appropriate written procedures that are designed to prevent microbiological contamination of drug products purporting to be sterile, and that include validation of all aseptic and sterilization processes (21 CFR 211.113(b))."

124. The FDA found that these deficiencies "raise questions about the ability of [Mylan's] current corporate quality system to achieve overall compliance with CGMP. Furthermore, several violations are recurrent and long-standing." Further, despite one Indian facility being acquired in 2013, Mylan was "on notice of the violations in Warning Letter 320-13-26, dated September 9, 2013. Even without this Warning Letter, [Mylan's] corporate quality system should have detected and corrected the forgoing violations without FDA intervention."

125. On April 3, 2017, the FDA issued a warning letter to Mylan following an inspection of one of Mylan's facilities in India, finding that[25]:

a. Mylan "failed to thoroughly investigate any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications, whether or not the batch has already been distributed (21 CFR 211.192)."

b. Mylan "failed to establish an adequate quality control unit with the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated (21 CFR 211.22(a))."

126. Mylan's Morgantown, West Virginia facility was inspected by the FDA in March and April 2018, finding that[26]:

a. "The responsibilities and procedures applicable to the quality control unit are not fully followed."

---

[25] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mylan-laboratories-limited-nashik-fdf-517906-04032017
[26] https://www.fda.gov/media/114553/download

b.  "Equipment and utensils are not cleaned and maintained at appropriate interval to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product."

c.  "Written procedures are not followed for the cleaning and maintenance of equipment, including utensils, used in the manufacture, processing, packing or holding of a drug product."

d.  "Procedures for the cleaning and maintenance of equipment are deficient regarding inspection of the equipment for cleanliness immediately before use."

e.  "Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity."

f.  "Reserve samples from representative sample lots or batches of drug products selected by acceptable statistical procedures are not examined visually at least once a year for evidence of deterioration."

g.  "There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess."

h.  "Written production and process control procedures are not followed in the execution of production and process control functions."

i.  "Changes to written procedures are not drafted, reviewed and approved by the appropriate organizational unit and reviewed and approved by the quality control unit."

j.  "Time limits are not established when appropriate for the completion of each production phase to assure the quality of the drug product."

k.  "There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed."

l.  "Drug product production and control records, are not reviewed and approved by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed."

m.  "Written records of investigation of a drug complaint do not include the follow-up."

127.    On November 9, 2018, the FDA issued a warning letter to Mylan following the inspection of the Morgantown facility, further emphasizing repeat violations and multiple Mylan sites.[27]

128.    On November 21, 2018, the FDA alerted patients and health care professionals to Mylan's recall of valsartan due to adulteration with NDEA.[28]

129.    Mylan's recklessness, negligence, and failure to adhere to CGMP resulted in the adulteration of VCDs with NDMA and NDEA.

130.    Because Mylan failed to adhere to CGMP, Mylan knew or had reason to know that their VCDs were being adulterated with NDMA and NDEA.

   **iv.    Aurobindo Defendants**

131.    Aurobindo operates API manufacturing facilities in Hyderabad, Telangana, India that manufacture valsartan, including the recalled VCDs.

132.    Aurobindo has been investigated multiple times by the FDA since it was first approved to export API to the United States, including investigations in 2016, 2017, and 2019 that found deviations from CGMP.

133.    Aurobindo was inspected by the FDA in June and July 2016, finding that[29]:

   a.    "Investigations are inadequate."

   b.    "[D]eviation record contains field 'Number of previous deviations in this product/system.' This field requires previous deviations of the same product or deviation type to be reported. No previous deviations were reported in this field."

134.    Aurobindo was inspected by the FDA in April 2017, finding that[30]:

---

[27] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mylan-pharmaceuticals-inc-557903-11092018
[28] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan
[29] https://www.fda.gov/media/105088/download
[30] https://www.fda.gov/media/104955/download

a.  "Laboratory controls do not include the establishment of scientifically sound and appropriate sampling plans and test procedures designed to assure that components and drug products conform to appropriate standards of identity, strength, quality and purity."

b.  "The quality control unit lacks authority to fully investigate errors that have occurred."

c.  "The responsibilities and procedures applicable to the quality control unit are not in writing and fully followed."

d.  "Deviations from written test procedures are not recorded and justified."

e.  "The sensitivity of test methods have not been [scientifically sound]."

f.  "Laboratory records do not include complete data derived from all tests, examinations and assay necessary to assure compliance with established specifications and standards."

135.  Aurobindo was inspected by the FDA in February and March 2019, finding that[31]:

a.  "The responsibilities and procedures applicable to the quality control unit are not fully followed."

b.  "Control procedures are not established which monitor the output and validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product."

c.  "There is a failure to thoroughly review any unexplained discrepancy whether or not the batch has been already distributed."

d.  "Employees engaged in the manufacture and processing of a drug product lack the training required to perform their assigned functions."

e.  "Aseptic processing areas are deficient regarding the system for monitoring environmental conditions."

f.  "Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not established and followed."

136.  On January 2, 2019, the FDA alerted patients and health care professionals to Aurobindo's recall of valsartan due to adulteration with NDEA.[32]

---

[31] https://www.fda.gov/media/122717/download
[32] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan

137.    Aurobindo's recklessness, negligence, and failure to adhere to CGMP resulted in the adulteration of VCDs with NDMA and NDEA.

138.    Because Aurobindo failed to adhere to CGMP, Aurobindo knew or had reason to know that their VCDs were being adulterated with NDMA and NDEA.

**D.  Defendants' Misrepresentations and Warranty Violations**

139.    Defendants, by seeking and gaining approval of their VCDs from the FDA and representing to pharmacies, pharmacy benefit managers, consumers, TPPs, and the public that their VCDs were approved by the FDA, represented and warranted to pharmacies, pharmacy benefit managers, consumers, TPPs, and the public that their VCDs were safe, FDA-compliant, merchantable, and fit for their ordinary purpose.

140.    Defendants are obligated under the Drug Supply Chain Security Act to quarantine and investigate potentially adulterated, misbranded, or non-FDA-approved drugs. Defendants, by marketing, advertising, offering for sale, and selling adulterated, misbranded, and non-FDA-approved VCDs, violated the Drug Supply Chain Security Act.

141.    Defendants warranted that their VCDs adhered to the label's representations and marketing and advertising related to the ingredients, formula, health effects, and FDA-approval.

142.    Most pharmacies secure indemnification from manufacturers for breach of these strict liability implied warranties.

143.    By adulterating their VCDs with NDMA, NDEA, and other unsafe ingredients, marketing and advertising such drugs, offering for sale such drugs, and selling such drugs, Defendants misrepresented their VCDs and violated their express and implied warranties.

144.    The VCDs sold by Defendants were therefore adulterated, misbranded, not FDA-approved, and illegal to sell in the United States.

## CLASS ALLEGATIONS

145.    Plaintiffs, individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

146.    The Class is defined as follows:

> **Nationwide Class:** All entities in the United States and its territories that, during the applicable liability period ("Class Period"), purchased a VCD produced, distributed, or sold by Defendants since January 1, 2012. For purposes of the Class definition, an entity "purchased" a VCD if it paid or reimbursed some or all of the purchase price.

147.    Plaintiffs further allege Statewide Subclasses in the alternative for each and every state in the United States and Puerto Rico, defined as follows:

> **[State or Territory] Subclass:** All entities in [State or Territory] that, during the applicable liability period ("Class Period"), purchased a VCD produced, distributed, or sold by Defendants since January 1, 2012. For purposes of the Class definition, an entity "purchased" a VCD if it paid or reimbursed some or all of the purchase price.

148.    The Class excludes the following: Defendants, their affiliates, and their current and former employees, officers and directors, and the Judge assigned to this case.

149.    Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

150.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. There are thousands of Class members, evidenced by Defendants' sale of VCDs throughout the United States. The Class is ascertainable by records in Defendant's possession.

151.    *Commonality*: Questions of law or fact common to the Class include, without limitation:

> a.    Whether VCDs manufactured, distributed, or sold by Defendants are adulterated with NDMA, NDEA, or any other unsafe ingredient;

b.   Whether VCDs manufactured, distributed, or sold by Defendants are misbranded;

c.   Whether VCDs manufactured, distributed, or sold by Defendants are not FDA-approved;

d.   Whether NDMA and NDEA are unsafe;

e.   Whether VCDs manufactured, distributed, or sold by Defendants are unsafe;

f.   Whether users of VCDs manufactured by Defendants are at greater risk of cancer or other health risks; and

g.   Whether purchasers of VCDs manufactured by Defendants are entitled to damages or other relief.

152.   *Typicality*: The claims or defenses of Plaintiffs are typical of the claims or defenses of the Class members. Class members were injured and suffered damages in substantially the same manner as Plaintiffs, Class members have the same claims against Defendants relating to the same course of conduct, and the Class members are entitled to relief under the same legal theories asserted by Plaintiffs.

153.   *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions including, but not limited to, breaches of warranties, product liability, product design defects, and state consumer fraud statutes.

154.   *Predominance*: Questions of law or fact common to Class members predominate over any questions affecting only individual members. Common questions such as the extent, nature, causes, results, scale, and health effects of the adulteration of VCDs, Defendants' knowledge and concealment of the adulteration, Defendants' representations and warranties regarding the VCDs, and Defendant's liability predominate over individual questions such as measurement of economic damages.

155.    *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all members of the Class is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

156.    *Manageability*: Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

157.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

158.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

159.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

## TOLLING OF STATUTES OF LIMITATIONS

160.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

161.    Plaintiffs and Class members had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

162.    Plaintiffs and Class members had no ability to determine or reason to suspect that Defendants' VCDs were adulterated with NDMA, NDEA, or any other non-FDA-approved ingredient before such fact was made public.

163.    Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

164.    Defendants are estopped from relying upon any statutes of limitations by reason of their fraudulent misrepresentation, suppression and concealment of material facts, and any applicable statutes of limitations are tolled by such conduct.

165.    Defendants did not inform Plaintiffs or Class members, and Plaintiffs and Class members had no reason to discover until recently, that Defendants' VCDs were adulterated, misbranded, or not FDA-approved.

166.    As a result of Defendants' omissions and misrepresentations, Plaintiffs and Class members did not know that Defendants' VCDs were adulterated, misbranded, or not FDA-approved.

## CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTIES
**(on behalf of Plaintiffs and Class against all Defendants)**

167.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

168.    UCC § 2-313 has been codified by all fifty States, the District of Columbia, and Puerto Rico. UCC § 2-313 states:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

169.    Defendants expressly warranted to Plaintiffs and Class members through advertising, marketing, labeling, packaging, and representations of their FDA-approval that their VCDs were fit for ordinary use as an FDA-approved, bioequivalent, generic version of their respective RLDs for treatment of high blood pressure and heart failure.

170.    Defendants distributed, offered for sale, and sold VCDs with this warranty.

171.    This warranty became part of the basis of the bargain that Plaintiffs and Class members reasonably and justifiably relied upon when purchasing Defendants' VCDs.

172.    Defendants' VCDs did not conform to this warranty because the drugs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

173.    Plaintiffs and Class members would not have paid for Defendants' VCDs if they knew that the drugs did not conform to the warranty.

174.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

## <u>COUNT II</u>
## BREACH OF IMPLIED WARRANTIES
### (on behalf of Plaintiffs and Class against all Defendants)

175.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

176.    UCC § 2-314 has been codified by all fifty States, the District of Columbia, and Puerto Rico. UCC § 2-314 states:

> (1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
>
> (2) Goods to be merchantable must be at least such as
>
> > (a) pass without objection in the trade under the contract description; and
> >
> > (b) in the case of fungible goods, are of fair average quality within the description; and
> >
> > (c) are fit for the ordinary purposes for which such goods are used; and
> >
> > (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
> >
> > (e) are adequately contained, packaged, and labeled as the agreement may require; and
> >
> > (f) conform to the promise or affirmations of fact made on the container or label if any.
>
> (3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

177.    Defendants are merchants within the meaning of the UCC.

178.    Defendants impliedly warranted to Plaintiffs and Class members that their VCDs were merchantable, fit for ordinary use as an FDA-approved, bioequivalent, generic version of their respective RLDs for treatment of high blood pressure and heart failure.

179.    Defendants distributed, offered for sale, and sold VCDs with this warranty.

180.    This warranty became part of the basis of the bargain that Plaintiffs and Class members reasonably and justifiably relied upon when purchasing Defendants' VCDs.

181.    Defendants' VCDs did not conform to this warranty and were not merchantable because the drugs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

182.    Plaintiffs and Class members would not have paid for Defendants' VCDs if they knew that the drugs did not conform to the warranty.

183.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

### COUNT III
### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *et seq.*
### (on behalf of Plaintiffs and Class against all Defendants except Pharmacy Defendants)

184.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

185.    As alleged above, Defendants expressly and impliedly warranted their VCDs.

186.    Defendants are warrantors within the meaning of the Magnuson-Moss Warranty Act.

187.    Plaintiffs and Class members are consumers within the meaning of the Magnuson-Moss Warranty Act.

188.    Plaintiffs and Class members were damaged by Defendants' failure to "comply with any obligation under [the Magnuson-Moss Warranty Act], or under a written warranty, implied warranty, or service contract."

189.    Defendants have been afforded a reasonable opportunity to cure such failure to comply but have not attempted to do so.

190.    Pursuant to 15 U.S.C. § 2310(d), Plaintiffs and Class members are entitled to damages, other legal and equitable relief, attorneys' fees and expenses.

### COUNT IV
### FRAUD
**(on behalf of Plaintiffs and Class against all Defendants except Pharmacy Defendants)**

191.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

192.    Defendants expressly and impliedly misrepresented to Plaintiffs and Class members through advertising, marketing, labeling, packaging, and representations of their FDA-approval that their VCDs were fit for ordinary use as an FDA-approved, bioequivalent, generic version of their respective RLDs for treatment of high blood pressure and heart failure.

193.    Defendants failed to notify, omitted, and concealed from Plaintiffs and Class members that their VCDs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

194.    Defendants knew or had reason to know that their misrepresentations and omissions were materially false or misleading.

195.    Defendants knew or had reason to know that their misrepresentations and omissions would induce Plaintiffs and Class members to pay for their VCDs.

196.    Defendants distributed, offered for sale, and sold VCDs subject to these misrepresentations and omissions.

197.    These misrepresentations and omissions became part of the basis of the bargain that Plaintiffs and Class members reasonably and justifiably relied upon when paying for Defendants' VCDs.

198.    Defendants' VCDs did not conform to Defendants' representations because the drugs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

199.    Plaintiffs and Class members would not have paid for Defendants' VCDs if they knew that the drugs did not conform to Defendants' representations.

200.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

**COUNT V**
**NEGLIGENT MISREPRESENTATION AND OMISSION**
**(on behalf of Plaintiffs and Class against all Defendants except Pharmacy Defendants)**

201.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

202.    Defendants had a duty to ensure that the advertising, marketing, labeling, packaging, and representations of FDA-approval of their VCDs were truthful, accurate, and not deceptive or misleading.

203.    Defendants expressly and impliedly misrepresented to Plaintiffs and Class members through advertising, marketing, labeling, packaging, and representations of their FDA-approval that their VCDs were fit for ordinary use as an FDA-approved, bioequivalent, generic version of their respective RLDs for treatment of high blood pressure and heart failure.

204.    Defendants failed to notify, omitted, and concealed from Plaintiffs and Class members that their VCDs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

205.    Defendants knew or had reason to know that their misrepresentations and omissions were materially false or misleading or had reckless or negligent disregard of the same.

206.    Defendants knew or had reason to know that their misrepresentations and omissions would induce Plaintiffs and Class members to pay for their VCDs or had reckless or negligent disregard of the same.

207.    Defendants distributed, offered for sale, and sold VCDs subject to these misrepresentations and omissions.

208.    These misrepresentations and omissions became part of the basis of the bargain that Plaintiffs and Class members reasonably and justifiably relied upon when paying for Defendants' VCDs.

209.    Defendants' VCDs did not conform to Defendants' representations because the drugs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

210.    Plaintiffs and Class members would not have paid for Defendants' VCDs if they knew that the drugs did not conform to Defendants' representations.

211.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

## COUNT VI
### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
**(on behalf of Plaintiffs and Class against all Defendants except Pharmacy Defendants)**

212.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

213.    Defendants expressly and impliedly misrepresented to Plaintiffs and Class members through advertising, marketing, labeling, packaging, and representations of their FDA-approval that their VCDs were fit for ordinary use as an FDA-approved, bioequivalent, generic version of their respective RLDs for treatment of high blood pressure and heart failure.

214.    Defendants failed to notify, omitted, and concealed from Plaintiffs and Class members that their VCDs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

215.    Defendants knew or had reason to know that their misrepresentations and omissions were materially false or misleading.

216.    Defendants knew or had reason to know that their misrepresentations and omissions would induce Plaintiffs and Class members to pay for their VCDs.

217.    Defendants distributed, offered for sale, and sold VCDs subject to these misrepresentations and omissions.

218.    These misrepresentations and omissions became part of the basis of the bargain that Plaintiffs and Class members reasonably and justifiably relied upon when paying for Defendants' VCDs.

219.    Defendants' VCDs did not conform to Defendants' representations because the drugs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

220.    Plaintiffs and Class members would not have paid for Defendants' VCDs if they knew that the drugs did not conform to Defendants' representations.

221.    Defendants' conduct constitutes unfair competition and/or unfair or deceptive acts in violation of the following state consumer protection statutes:

a.    Ala. Code § 8-19-1, *et seq.*;

b.    Alaska Stat. § 45.50.471, *et seq.*;

c.    Ariz. Rev. Stat. Ann. § 44-1522, *et seq.*;

d.    Ark. Code Ann. § 4-88-101, *et seq.*;

e.    Cal. Bus. & Prof. Code § 17200, *et seq.*;

f.    Cal. Bus. & Prof. Code § 17500, *et seq.*;

g.    Cal. Civ. Code § 1750, *et seq.*;

h.    Colo. Rev. Stat. § 6-1-105, *et seq.*;

i.    Conn. Gen. Stat. § 42-110b, *et seq.*;

j.    Del. Code Ann. tit. 6, § 2531, *et seq.*;

k.    D.C. Code § 28-3901, *et seq.*;

l.    Fla. Stat. § 501.201, *et seq.*;

m.    Ga. Code. Ann. § 10-1-392, *et seq.*;

n.    Haw. Rev. Stat. § 480, *et seq.*;

o.    Idaho Code § 48-601, *et seq.*;

p.    815 Ill. Comp. Stat. 505/1, *et seq.*;

q.    Ind. Code § 24-5-0.5.1, *et seq.*;

r.    Iowa Code § 714H, *et seq.*;

s.    Kan. Stat. Ann. § 50-623, *et seq.*;

t.    Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

u.   La. Stat. Ann. § 51:1401, *et seq.*;

v.   5 Me. Stat. § 207, *et seq.*;

w.   Md. Code Ann., Com. Law § 13-301, *et seq.*;

x.   Mass. Gen. Laws ch. 93A, § 1, *et seq.*;

y.   Mich. Comp. Laws § 445.901, *et seq.*;

z.   Minn. Stat. § 325F.67, *et seq.*;

aa.   Miss. Code Ann. § 75-24-1, *et seq.*;

bb.   Mo. Rev. Stat. § 407.010, *et seq.*;

cc.   Mont. Code Ann. § 30-14-101, *et seq.*;

dd.   Neb. Rev. Stat. § 59-1601, *et seq.*;

ee.   Nev. Rev. Stat. § 598.0903, *et seq.*;

ff.   N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*;

gg.   N.J. Stat. Ann. § 56:8-1, *et seq.*;

hh.   N.M. Stat. Ann. § 57-12-1, *et seq.*;

ii.   N.Y. Gen. Bus. Law § 349, *et seq.*;

jj.   N.Y. Gen. Bus. Law § 350, *et seq.*;

kk.   N.C. Gen. Stat. § 75-1.1, *et seq.*;

ll.   N.D. Cent. Code § 51-15-01, *et seq.*;

mm.   Ohio Rev. Code Ann. § 1345.01, *et seq.*;

nn.   Okla. Stat. tit. 15, § 751, *et seq.*;

oo.   Or. Rev. Stat. § 646.605, *et seq.*;

pp.   73 Pa. Stat. Ann. § 201-1, *et seq.*;

qq.   R.I. Gen. Laws § 6-13.1-1, *et seq.*;

rr.   S.C. Code Ann. § 39-5-10, *et seq.*;

ss.   S.D. Codified Laws § 37-24-1, *et seq.*;

tt.   Tenn. Code Ann. § 47-18-101, *et seq.*;

uu.   Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*;

vv.   Utah Code Ann. § 13-11-1, *et seq.*;

ww.  Vt. Stat. Ann. tit. 9, § 2451, *et seq.*;

xx.   Va. Code Ann. § 59.1-196, *et seq.*;

yy.   Wash. Rev. Code § 19.86.010, *et seq.*;

zz.   W. Va. Code § 46A-6-101, *et seq.*;

aaa.  Wis. Stat. § 100.20, *et seq.*;

bbb.  Wyo. Stat. Ann. § 40-12-100, *et seq.*; and

ccc.  P.R. Laws Ann. tit. 23, § 1001, *et seq.*

222.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

## COUNT VII
## UNJUST ENRICHMENT
### (on behalf of Plaintiffs and Class against all Defendants except Pharmacy Defendants)

223.   Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

224.   Defendants expressly and impliedly warranted and misrepresented to Plaintiffs and Class members through advertising, marketing, labeling, packaging, and representations of their FDA-approval that their VCDs were fit for ordinary use as an FDA-approved, bioequivalent, generic version of their respective RLDs for treatment of high blood pressure and heart failure.

225.    Defendants failed to notify, omitted, and concealed from Plaintiffs and Class members that their VCDs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

226.    Defendants knew or had reason to know that their misrepresentations and omissions were materially false or misleading or had reckless or negligent disregard of the same.

227.    Defendants knew or had reason to know that their misrepresentations and omissions would induce Plaintiffs and Class members to pay for their VCDs or had reckless or negligent disregard of the same.

228.    Defendants distributed, offered for sale, and sold VCDs subject to these misrepresentations and omissions.

229.    These misrepresentations and omissions became part of the basis of the bargain that Plaintiffs and Class members reasonably and justifiably relied upon when paying for Defendants' VCDs.

230.    Defendants' VCDs did not conform to Defendants' representations because the drugs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

231.    Plaintiffs and Class members would not have paid for Defendants' VCDs if they knew that the drugs did not conform to Defendants' representations.

232.    Defendants knowingly accepted and retained profits from Plaintiffs' and Class members' purchases of their VCDs.

233.    It would be unjust for Defendants to retain such profits due to Defendants' misrepresentations and omissions that induced Plaintiffs and Class members to pay for their VCDs.

234.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

235.    Plaintiffs and Class members are entitled to restitution from Defendants for the purchase of their VCDs.

**COUNT VIII**
**NEGLIGENCE**
**(on behalf of Plaintiffs and Class against all Defendants except Pharmacy Defendants)**

236.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

237.    Defendants had a duty to exercise reasonable care in manufacturing VCDs.

238.    Defendants had a duty to ensure that the advertising, marketing, labeling, packaging, and representations of FDA-approval of their VCDs were truthful, accurate, and not deceptive or misleading.

239.    Defendants owed a duty of care to Plaintiffs and Class members who were the likely and foreseeable purchasers and users of Defendants' VCDs.

240.    Defendants failed to exercise reasonable care in manufacturing VCDs, evidenced by the drugs' adulteration with NDMA, NDEA, and other unsafe, non-FDA-approved ingredients.

241.    Defendants expressly and impliedly misrepresented to Plaintiffs and Class members through advertising, marketing, labeling, packaging, and representations of their FDA-approval that their VCDs were fit for ordinary use as an FDA-approved, bioequivalent, generic version of their respective RLDs for treatment of high blood pressure and heart failure.

242.    Defendants failed to notify, omitted, and concealed from Plaintiffs and Class members that their VCDs were adulterated with NDMA, NDEA, or other non-FDA-approved

ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

243.    Defendants knew or had reason to know that their manufacturing processes and failure to adhere to CGMP would result in adulteration of their VCDs.

244.    Defendants knew or had reason to know that their misrepresentations and omissions were materially false or misleading or had reckless or negligent disregard of the same.

245.    Defendants knew or had reason to know that their misrepresentations and omissions would induce Plaintiffs and Class members to pay for their VCDs or had reckless or negligent disregard of the same.

246.    Defendants distributed, offered for sale, and sold VCDs subject to these misrepresentations and omissions.

247.    These misrepresentations and omissions became part of the basis of the bargain that Plaintiffs and Class members reasonably and justifiably relied upon when paying for Defendants' VCDs.

248.    Defendants' VCDs did not conform to Defendants' representations because the drugs were adulterated with NDMA, NDEA, or other non-FDA-approved ingredients, were misbranded, were not FDA-approved, and were not bioequivalent to their respective RLDs.

249.    Plaintiffs and Class members would not have paid for Defendants' VCDs if they knew that the drugs were adulterated, misbranded, or not FDA-approved.

250.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

**COUNT IX**
**NEGLIGENCE PER SE**
**(on behalf of Plaintiffs and Class against all Defendants except Pharmacy Defendants)**

251.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

252.    Defendants had a duty to exercise reasonable care in manufacturing VCDs by adhering to CGMP, as required by the Federal Food, Drug, and Cosmetic Act as well as state and local law.

253.    Defendants had a duty to ensure that drugs advertised, marketed, labeled, packaged, and represented as being FDA-approved as bioequivalent to their respective RLD are bioequivalent to their RLD, as required by the Federal Food, Drug, and Cosmetic Act as well as state and local law.

254.    Defendants failed to adhere to CGMP, adulteration, and bioequivalence laws and regulations, resulting in the manufacture and sale of adulterated and unsafe VCDs.

255.    Plaintiffs and Class members are the likely and foreseeable purchasers and users of Defendants' VCDs.

256.    Plaintiffs and Class members paid for Defendants' VCDs.

257.    Plaintiffs and Class members would not have paid for Defendants' VCDs if they knew that the drugs were adulterated, misbranded, or not FDA-approved.

258.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for a judgment against Defendants as follows:

a.    For an order certifying the Class, appointing Plaintiffs as the Representatives of the Class, and appointing the law firms representing Plaintiffs as counsel for the Class;

b.    For a declaration that Defendants are liable for each and every cause of action enumerated above;

58

    c.   For damages, restitution, and/or refund of all funds acquired by Defendants from Plaintiffs and Class members as a result of Defendant's unlawful, unfair, deceptive, and unconscionable practices described herein, including actual, statutory, punitive, and/or trebled damages to the extent permitted by law in an amount to be proven at trial;

    d.   Payment of costs and expenses of suit herein incurred;

    e.   Both pre-and post-judgment interest on any amounts awarded;

    f.   Payment of reasonable attorneys' fees and expert fees;

    g.   Such other and further relief as the Court may deem proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury.

Dated: January 30, 2020

Respectfully submitted,

*/s/ David Cates*

David Cates (6289198)
CATES MAHONEY, LLC
216 W Pointe Drive, Suite A
Swansea, IL 62226
T: (618) 277-3644
F: (618) 277-7882
E: DCates@cateslaw.com

Charles J. Baricevic (6305418)
CHATHAM & BARICEVIC
107 West Main Street
Belleville, IL 62220
T: (618) 233-2200
F: (618) 233-1589
E: cj@chathamlaw.org

Daniel C. Levin
Charles E. Schaffer
Nicholas J. Elia
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
T: (215) 592-1500

F: (215) 592-4663
E: DLevin@lfsblaw.com
   CSchaffer@lfsblaw.com
   Nelia@lfsblaw.com

Nicholas A. Migliaccio
MIGLIACCIO & RATHOD LLP
412 H Street N.E., Suite 302
Washington, D.C. 20002
T: (202) 470-3520
F: (202) 800-2730
E: nmigliaccio@classlawdc.com

Aaron Rihn
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
T: (412) 281-7229
F: (412) 281-4229
E: arihn@peircelaw.com